UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| MICHAEL TRUCKEY, Plaintiff | ) | |
| v. | ) | CIVIL NO. 2:10 cv 447 |
| MICHAEL J. ASTRUE, Commissioner, Social Security Administration, Defendant | ) | |

OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, Michael Truckey, on November 8, 2010. For the reasons set forth below, the decision of the Commissioner is **REMANDED.**

Background

The claimant, Michael Truckey, applied for Disability Insurance Benefits and Supplemental Security Income on February 12, 2008, alleging a disability onset date of June 1, 2006. (Tr. 10) His claim initially was denied on May 28, 2008, and again upon reconsideration on July 9, 2008. (Tr. 10, 80, 92, 99) Truckey requested a hearing before an Administrative Law Judge. ("ALJ") A hearing before ALJ Jose Anglada was held on October 21, 2009, at which Truckey and vocational expert Lee Knutson testified. (Tr. 10)

On March 4, 2010, the ALJ issued his decision denying benefits. (Tr. 7) The ALJ found that Truckey was not under a disability within the meaning of the Social Security Act from June 1, 2006, through the date he issued his decision. (Tr. 10) Following a denial of Truckey's request for review by the Appeals Council, he filed his complaint with this court.

Truckey was born on October 6, 1961, making him 48 years old on the date of the ALJ's decision. (Tr. 10, 17) He is 6'3" tall and weighs approximately 225 pounds. (Tr. 165) Truckey is single and resides with his mother and minor son. (Tr. 27–28) He last worked as a grinder for Jupiter Aluminum in 2006. (Tr. 29) Prior to that, Truckey worked for many years as a roofing laborer before quitting in 2006 due to an aggravation of a previous back injury. (Tr. 29-39)

During his treatment with various doctors, Truckey was diagnosed with the following impairments: diabetes with poly-neuropathy, degenerative disc disease of the cervical and lumbar spine, hypertension, rotator cuff tear impingement, and substance abuse. (Tr. 12) In February 2009, Truckey started receiving treatment for attention deficit disorder (ADD) and bipolar disorder. (Tr. 64-65) In April 2009, Truckey went to Tri-City Community Mental Health and saw social worker Angelia Erb for individual therapy three times. (Tr. 317-321)

During his treatment with Erb, Truckey reported feeling frustrated and anxious about his domestic relations with his youngest son's mother. (Tr. 317) Truckey indicated that this caused him to consider drinking. (Tr. 317) Truckey also indicated that he was willing to consider attending either Alcoholics Anonymous or Narcotics Anonymous. (Tr. 318) He also reported that he was easily angered and irritated, which prompted Erb to ask Truckey to keep a journal of his thoughts. (Tr. 318, 319) Erb reported that Truckey was willing to keep a journal. (Tr. 319)

On April 27, 2009, Truckey admitted to Erb that he had relapsed and got drunk. (Tr. 320) Erb gave Truckey handouts for Narcotics Anonymous meetings, and he agreed to complete the handouts. (Tr. 321) On May 6, 2009, Truckey reported to Erb that he had thought about what he had read in the handouts but that he was unable to finish the last handout. (Tr. 323–24)

On June 3, 2009, Truckey consulted psychologist Dr. Robert Coyle for an examination at the request of his attorney. (Tr. 305-314) Truckey reported to Dr. Coyle that he had an eighth grade education and then he quit school in the ninth grade. (Tr. 306) He also indicated that his grades were poor and that he did not take special education classes. (Tr. 306) Hammond School records show Truckey formally withdrew from school in May 1978 at the age of 16. (Tr. 258) The records also reflect that Truckey

was receiving a grade of "F" in all classes, including Reading and English. (Tr. 258)

Dr. Coyle conducted numerous tests involving Truckey's mental abilities and emotional state. (Tr. 305) Dr. Coyle concluded that Truckey functioned within the borderline range of general intelligence. (Tr. 312) Dr. Coyle also found Truckey's reading skills to be on a fourth grade level for both word recognition and comprehension and within the functional range. (Tr. 312, 313) However, written expression was found to be at a first grade level for both spelling and sentence writing. Dr. Coyle considered this to be sub-literate or functional illiteracy. (Tr. 312, 313) Truckey's math skills ranged from a fourth grade level in word problem solving to a sixth grade level in rote calculation skills. (Tr. 312)

Regarding Truckey's emotional state, Dr. Coyle found the results of testing to be indicative of paranoid personality features and anxiety. (Tr. 312, 313) However, Dr. Coyle did not feel the test results rose to a level that warranted a formal diagnosis. (Tr. 312) Dr. Coyle also concluded that Truckey had a poly substance abuse disorder, which appeared to be in remission. (Tr. 312, 313) Additionally, Truckey was found to have a great deal of difficulty maintaining a consistent level of concentration on ADD and ADHD tests. (Tr. 312)

At the hearing before the ALJ, Truckey testified that he was not a good reader. (Tr. 60) He further explained that he was unable to read a newspaper, fast food menu, or take his driver's license test. (Tr. 72-73) For such tasks, he relied on the assistance of others. (Tr. 72-73) Truckey further testified that he could recognize a street sign by its shape. (Tr. 73) When asked by the ALJ if he could fill out a job application at McDonald's, Truckey responded that he could fill in his name, social security number, and address, but nothing more. (Tr. 60-61)

Truckey testified that his diagnosed physical impairments limited his abilities. He stated that his neuropathy caused numbness and tingling in his feet and that his diabetes sometimes caused dizzy spells. (Tr. 39-40) He further testified that he took a prescription muscle relaxer, Flexeril, for his back pain and that he had a tear in his right rotator cuff. (Tr. 45, 48)

Together, Truckey claimed these impairments limited his ability to stand for no longer than 15 minutes, sit for no longer than 20 minutes, and walk no longer than 75 feet without resting. (Tr. 43, 51) Additionally, he testified that he can lift and carry only ten pounds, but no more than three pounds with his right hand specifically. (Tr. 44, 48) When asked by the ALJ if he could bend over to pick up a $100 bill from the sidewalk, Truckey stated that he would not be able to do so. (Tr. 44) Truckey acknowledged that he was able to perform light housework,

let his dogs go outside, play with his son, and fix his son's meals. (Tr. 50-54)

While discussing his treatment with Tri-City Community Mental Health, Truckey testified that he received treatment for his anxiety, restlessness, and inability to concentrate. (Tr. 64-65) When asked about his inability to concentrate, Truckey indicated that he had problems concentrating while watching television or having a conversation. (Tr. 65) During both activities, Truckey said he would "wander off" and "wind up thinking of something else." (Tr. 65)

Vocational Expert (VE) Lee Knutson was last to testify. (Tr. 66) The ALJ posed a hypothetical question asking what work was available in the national economy for a younger individual with a limited education and Truckey's background, who could: lift and carry no more than 20 pounds occasionally and ten pounds frequently with his left hand and no more than ten pounds occasionally with is right hand; stand or walk no more than a total of four hours in an eight-hour day; occasionally bend, squat, kneel, or crouch; never work at heights or climb ladders; and never perform work that required prolonged focus and intense concentration. (Tr. 68) The VE testified that such a person could perform the sedentary, unskilled jobs of final assembler (3,300 jobs in the Chicagoland and northwest Indiana region); wafer breaker for

semiconductors (3,900 regional jobs); and dowel inspector (800 regional jobs). (Tr. 69-70)

The ALJ asked the VE to explain how he applied the term "literacy" in vocational terms. (Tr. 72) The VE testified that he looked at functional literacy as the ability to read a newspaper and that this ability was at the sixth or seventh grade reading level. (Tr. 71-72) He considered literacy on a more functional level as whether a claimant could do basic reading as determined by using a newspaper to evaluate his ability. (Tr. 72)

The VE further testified that if Truckey could not read a menu or a newspaper, he probably could not read a job application. (Tr. 73) Such a scenario would be "pretty close to functional illiteracy." (Tr. 73) Although the VE stated that he did not know exactly how the regulations described illiteracy, he indicated that there would be a high or significant vocational impact if someone could not read a newspaper or menu. (Tr. 74) The VE clarified that he did not expect someone to read and understand every word but that he should be able to pick up the newspaper and get the general gist of a story. (Tr. 74) The VE concluded that if a person could not read a newspaper or a menu, he "would think that [he or she is] functionally illiterate." (Tr. 74)

In his decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was

disabled. (Tr. 11-12) In step one, the ALJ found that Truckey had not engaged in substantial gainful activity since June 1, 2006, his alleged onset date. (Tr. 12) The ALJ noted that Truckey had worked after the alleged disability date, but, because he only earned $2,755.55 during 2006, $11,817.00 during 2007, and nothing during 2008 and 2009, that was considered an unsuccessful work attempt. (Tr. 12) At step two, the ALJ found that Truckey had the following severe impairments: diabetes with polyneuropathy, degenerative disc disease of the cervical and lumbar spine, hypertension, probable partial rotator cuff tear impingement, and substance abuse. (Tr. 12) At step three, the ALJ found that Truckey's impairments did not meet or medically equal one of the listed impairments. (Tr. 12) In particular, Truckey's diabetes did not meet or medically equal the Listing 9.08 impairment, his hypertension did not meet or medically equal the Listing 4.00 impairment, and his rotator cuff tear did not meet or medically equal the Listing 1.02 impairment. (Tr. 13)

In determining Truckey's RFC, the ALJ stated that he considered the entire record and found that Truckey had the capacity to perform a significant range of sedentary work involving lifting and carrying 20 pounds occasionally and 10 pounds frequently; lifting no more than 10 pounds occasionally with his right dominant arm; standing and walking for four hours in an eight hour work day while only occasionally bending, squatting, kneel-

ing, and crawling; not working at heights or climbing ladders; and not being exposed to work that requires prolonged focused and intense concentration. (Tr. 16)

In reaching this determination, the ALJ first considered all symptoms and the extent to which those symptoms reasonably could be accepted as consistent with the objective medical evidence, as well as opinion evidence presented. (Tr. 16) In considering Truckey's symptoms, the ALJ first determined whether there were any underlying medically determinable physical or mental impairments that could produce Truckey's pain or symptoms. (Tr. 17) Next, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms with respect to Truckey's functioning. In order to evaluate the intensity, the ALJ also evaluated the credibility of the statements made by Truckey regarding them. (Tr. 17) To that end, the ALJ found that Truckey's testimony regarding his pain and symptoms was exaggerated as compared to the medical records presented. Therefore, the ALJ found that Truckey's testimony was not credible to the extent that it was inconsistent with the RFC assessment. (Tr. 17)

At step four, the ALJ used the determined RFC and found that Truckey could not perform his past relevant work. (Tr. 17) Additionally, the ALJ found that Truckey had a limited education but was able to communicate in English. (Tr. 18) At step five, the ALJ considered Truckey's age, education, work experience, and

RFC to find that there were jobs that existed in significant numbers in the national economy which Truckey could perform, including assembler (3,300 jobs), machine tender (3,500 jobs), and inspector-weigher or checker. (Tr. 18)

Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Schmidt v. Barnhart***, 395 F.3d 737, 744 (7th Cir. 2005); ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* ***Consolidated Edison Company v. NLRB***, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* ***Jens v. Barnhart***, 347 F.3d 209, 212 (7th Cir. 2003); ***Sims v. Barnhart***, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. ***Rice v. Barnhart***, 384 F.3d 363, 368-369 (7th Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002). However, "the

decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez***, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §404.1520, §416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b), 416.920(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c), §416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowl-

edged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. §404.1520(e), §416.920(e). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f), §416.920(f).

Truckey only raises one challenge to the ALJ's denial of disability benefits, whether his determination that Truckey had a limited education is supported by substantial evidence. An ALJ must articulate, at minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. ***Scott***, 297 F.3d at 595; ***Diaz v. Charter***, 55 F.3d 300, 307 (7th Cir. 1995); ***Green v. Shalala***, 51 F.3d 96, 101 (7th Cir. 1995). If the decision lacks evidentiary support or is so poorly

articulated as to prevent meaningful review, it cannot stand. ***Steele v. Barnhart***, 290 F.3d 936, 940 (7th Cir. 2002).

Once the five-step sequential evaluation reaches step five, the ALJ must determine the claimant's education as a vocational factor. 20 C.F.R. §416.920(f). To determine education, the ALJ is guided by the regulations:

> (1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.
>
> (2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.
>
> (3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.
>
> (4) High school education and above. High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that some-

> one with these educational abilities can do semi-skilled through skilled work.

20 C.F.R. §404.1564(b)

If a determination of illiteracy is found, the ALJ must apply medical vocation grid 201.17. 20 C.F.R. pt. 404, subpt. P, app. 2. Under this rule, an individual who is age 45–49, is illiterate or unable to communicate in English, is unskilled, and limited to sedentary work, should be found disabled. Therefore, if Truckey were found to be illiterate, he would be considered disabled and entitled to benefits in light of the ALJ's other findings, which are not challenged here.

Truckey claims the ALJ failed to explain adequately his determination that Truckey fell into the third category (limited education) as opposed to the first category (illiteracy), and therefore was not disabled. Both parties cite ***Glenn v. Secretary of Health and Human Services***, 814 F.2d 387 (7th Cir. 1987), as precedent on the level of explanation an ALJ must provide when making a literacy determination. In ***Glenn***, the claimant was found to have a marginal education, as opposed to being found illiterate, and thus not disabled under vocational grid rule 201.17. *See* ***Glenn***, 814 F.2d at 389. *See also* 20 C.F.R. pt. 404, subpt. P, app. 2. The Commissioner argues ***Glenn*** is controlling because, similar to Truckey's case, the ALJ failed to "elaborate his conclusion that Glenn was literate." ***Glenn***, 814 F.2d at 392.

The Court of Appeals reviewed the record and concluded that "a close case such as this is judgmental, and courts will rarely be able to say that the administrative law judge's finding was not supported by substantial evidence." ***Glenn***, 814 F.2d at 392. Thus, even with the ALJ's failure to elaborate on his conclusion of marginal education, the court found the decision to be supported by substantial evidence. ***Glenn***, 814 F.2d at 392.

Unlike ***Glenn***, this case does not involve a "close call". In ***Glenn***, the evidence indicated that Glenn fell squarely on the line between illiteracy and marginal education. As such, the evidence on its face provided all the explanation needed for a reviewing court to understand why the ALJ would decide either illiteracy or marginal education. ***Glenn***, 814 F.2d at 391. In other words, the record was such that the only thing left for the ALJ to do was make a pure judgment call. ***Glenn***, 814 F.2d at 391. Based on administrative law principles of deferring to the ALJ on subjective determinations, the court left the decision untouched, even without an elaboration on the marginal education conclusion.

Here, the matter of literacy was not such a "close call." It is possible that reasonable minds may disagree whether Truckey was either illiterate or had a limited education. Both categories are separated by marginal education and, as such, did not

provide for such a judgment call. The evidence did not reflect that Truckey fell squarely on the line between two categories.

On the one hand, the record contains facts that indicate Truckey may be classified as having a limited education. Truckey completed either eighth or tenth grade and testified that he could read a newspaper, but not much of it. (Tr. 59–60) Truckey also stated that he could not write much more than his name, address, and social security number on a job application. (Tr. 60–61) Truckey's therapist, Erb, reported that Truckey was willing to keep a journal. (Tr. 319) Additionally, Truckey reported to Erb that he had been thinking about what he had read in his handouts. (Tr. 324)

On the other hand, the record also contains facts that indicate Truckey might have been classified as illiterate. Truckey testified that he could not read a fast food menu or write more than his name or social security number. (Tr. 60, 73). Truckey further testified that he could not read the driver's license test at the license branch. (Tr. 72) As for Erb's reports, they did not provide specifics regarding how well or how much Truckey was able to read the materials provided. In fact, there was evidence that he was unable to complete some of the assigned pamphlets. (Tr. 324) Furthermore, Truckey underwent psychological testing, the results of which indicated Truckey had

a reading ability of a fourth grader and the writing ability of a first grader. (Tr. 312, 313) Even more, the vocational expert testified that he believed Truckey to be functionally illiterate. (Tr. 312, 313) Taken together, this evidence would appear to indicate Truckey had the inability to read or write, making him illiterate.

When reasonable minds can disagree as to the ALJ's conclusion, as is the case here, the ALJ's decision should be affirmed unless the reasoning is "so poorly articulated as to prevent meaningful review." ***Steele***, 290 F.3d at 940. Based on the record, the gap between concluding Truckey was illiterate or that he had a limited education required a logical bridge to traverse. Without such a bridge, this court is unable to provide a meaningful review of the ALJ's decision without re-weighing evidence or substituting its own reasoning or judgment. *See* ***Powers v. Apfel***, 207 F.3d 431, 434 (7th Cir. 2000) (prohibiting the court from deciding facts anew, re-weighing evidence, or substituting judgment). Therefore, the ALJ's conclusory statement that Truckey has a "limited education," without more, was not enough to support the decision that Truckey was not disabled.

The Commissioner further argues that even absent an express articulation, the ALJ implied his reasoning from other steps of the sequential evaluation. The Commissioner points to the hypo-

thetical posed by the ALJ to the vocational expert. In the scenario given, the ALJ asked the vocational expert to identify representative jobs in the regional economy for a person of Truckey's age, vocational background, limited education, and RFC. Here, the ALJ considered the fact that Truckey did not have a special education background when determining that he should be restricted from work that required prolonged focus and intense concentration.

The Commissioner wants to infer from the fact that limited education was included alongside an RFC determination that the ALJ also must have considered the relevant literacy facts when making his literacy determination. Again, recent cases have been critical of the Commissioner's attempt to establish reasoning in the record where the ALJ has given none. *See* ***Schimpf v. Astrue***, 780 F.Supp.2d 798, 802–03 (S.D. Ind. 2011) (remanding because the ALJ failed to articulate any reason why the claimant fell into the limited education category rather than the illiterate category). Furthermore, "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." ***SEC v. Chenery Corp.***, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). Here, the ALJ has not provided any grounds upon which his literacy determination may be evaluated. This court declines the invitation to supply

reasoning in the absence of any provided by the ALJ. As such, the inadequate explanation in the record regarding Truckey's literacy cannot be cured by post decision inferences or speculative reasoning.

Truckey also claims that the ALJ failed to apply the medical vocational grids, which are triggered when a determination of illiteracy is found. For the reasons previously stated, the ALJ did not adequately articulate the reason for his finding that Truckey had a limited education. As such, the issue cannot be reached because a meaningful review is not possible. The ALJ first must articulate his reason for finding that Truckey has a limited education. At that time, the court can evaluate whether the ALJ's finding was supported by substantial evidence and whether the medical vocational grid must be applied.

---

Because the question of whether Truckey was illiterate for purposes of receiving Social Security benefits is dispositive of this case, it shall be **REMANDED.** Upon remand, the ALJ must articulate the reasons for his education finding. If the ALJ determines that Truckey was illiterate, he must apply the medical vocational grid.

ENTERED this 27th day of October, 2011

s/ ANDREW P. RODOVICH
United States Magistrate Judge